or arguments not to exceed 15 minutes per side. Mr. Pierre Bergeron for the appellants. Good morning, your honors. May it please the court, I'd like to reserve three minutes for rebuttal. Very well. Your honors, in Weary, Ware, and Walcott, this court held an insurance  agents are independent contractors. Those decisions are consistent with cases throughout the country, including federal courts that have specifically evaluated American Family Agents. Darden emphasized the virtue of predictability and categorical judgments, and departing from this authority will undermine how the insurance industry itself is structured. The contract here... The big distinction with Weary, though, to me, is that those persons represented a lot of different insurance companies, whereas these are limited to one. Not only do they do represent only one, but they're limited to one. Your honor, but if true... Well, this is an exclusive relationship here. But in Weary, as Judge Clay pointed out in his dissent, the contract there was the same as the contract here. It says you're only allowed to sell for this insurance company. The issue in Weary, apparently he was, he did still sell for some others, but it was an exclusive contractual relationship. He was violating the contract when he did that in Weary? That was Judge Clay's point in dissent. He was either violating the contract or he had permission. Well, it's the majority with all respect. No, no, no. The majority opinion assumed that there were... That's correct. The court did recognize that, but Walcott was an exclusive relationship. I mean, this court... Ware was also, wasn't it? It was, your honor. So this court has dealt with exclusive relationships before, and as the amicus have pointed out, this is mainstream structure for the industry. And here we have a contract that specifically provides that these agents are independent contractors. And it spells out many of the Darden criteria in the contract. And particularly because this is an ERISA case, we have to look at what is the financial bargain that the party struck. And it was for a set commission rate without benefits. I mean, that was what the party signed up for in the agreement. And it's undisputed here that... Is it clear that this case only deals with ERISA, that it won't be, it won't control all the other ways in which they're independent contractors? That's correct. There are only ERISA claims here. And of course, I think if you look at Ware, Ware emphasized the need to consider what the statutory context was. Are there out in the real world a lot of situations where for one purpose you're an independent contractor and for another purpose you're not? I don't think so, your honor. And what I would say on that is that if you look at all the cases at the federal circuit level that have addressed this question, it has been in myriad different contexts. They've all reached the same conclusion. I'm not telling you that we're going to have different conclusions for insurance agents, but I would say that our case is stronger because it is... And if there are other occupations where you have people who are for ERISA, they're an independent contractor, but for tax they're not, but for vicarious liability they are, but for workers' comp they're not. I mean, does that happen or is that just... It's probably more... Strange. I'm not sure whether that helps you or hurts you, but it seems like it's an unusual situation to have someone be one but not be one. I think we're acknowledged in a footnote that that's theoretically possible, but I'm not aware of situations where that's occurred. Well, that would suggest that if we decide this and it then... If we decide this against you and affirm that it would apply to other kinds of contexts as well. Your honor, it's possible. I think what my point... The point I'm making about ERISA is this is a stronger case for us than this court has dealt with before. For instance, in Ware and Weary where it was not ERISA because the need to focus on what the financial bargain was and what the agreement was with respect to benefits. And if you look at the Darden factors here, it's really undisputed that six of them point in our favor. You know, on this case, the district court found a lot of control over the day-to-day work of these individuals and the economic opportunities that they would experience. Maybe you should address or could address that aspect of what occurred below and get your take on that. Your honor, if you look at paragraph 10 of the court's order, that's where he uses the phrase day-to-day activities. But I encourage the court to look at the entire paragraph because right after saying that, the judge gives examples and he says the managers are involved in goal setting, creating business plans, and ensuring compliance with goals and objectives. That's our whole point about his misunderstanding of control. He's talking about day-to-day activities, but the examples are goals and objectives, which is exactly what Weary said is understandable to have control over that. And then the judge says that the manager's performance was dependent upon the results obtained by the agents. Again, we're getting to what was the ultimate result, the goals and objectives. That's what the court is talking about. And if you look at, when you talk about control over the economic opportunities, again, we're better positioned than Weary were in Walcott because if you look at Walcott, for instance, there was a one-year non-compete and a lifetime non-solicitation. We only have a one-year non-solicitation. And the testimony was that Mr. Jamal started working immediately after termination of the agreement for a competitor. So they can do that. And he also worked, I think he had a side job as well during his tenure as an American family agent. Of course, don't we have to look at the context? These people were not permitted to work for any other company in this line of work or any other insurance company. They had to do everything they did for this company. Isn't that correct, just to place all this in context? That's correct, Your Honor. And again, it's indistinguishable from Wear, which also was an exclusive relationship, and from at least the contract that was at issue in Weary. The court found that the factors here were almost evenly split. And so a lot depends on its conclusion on the underlying factors. And I just want to highlight two. The first is the when and how long to work factor. And the reason I highlight that is because the district court said that that weighed slightly in favor of employee status. The legal conclusion there is inconsistent with both Wear and Weary, and the plaintiffs don't defend it. So at a minimum, that has to be moved into the independent contractor column. Secondly, with respect to the skill, again, the district court's decision was inconsistent with what this court held in Weary. Weary quoted Schweiger from the Eighth Circuit, which said, insurance agents are skilled, and this weighs heavily in favor of independent contractor status. The district court went the other way, largely relying, Judge Clay, on your dissent from Weary. Well, the dissent is heresy, so I don't know how you can rely on that too much. My point is, that issue was decided in Weary. And the district court is departing from Weary in its analysis of this factor. This factor also has to go to the district court. Counsel, you talk, in effect, about the stakes that are involved in our decision in this case. I want to try to focus a little bit on what the stakes are. I'm the opposite of an expert on ERISA. A lot of it I don't understand. But I thought ERISA was protection for retirement plans. So if you don't have retirement plans, there's nothing there to protect. Is that kind of true? I mean, it's like, they have to be well funded, you have to have the right notices, you have to have all this kind of stuff, you have to pay what you promised to pay and everything. But if you just don't have a retirement plan, ERISA doesn't require you to have one, or does it? No, Your Honor, I don't believe it does. So if, in fact, these people don't have, and now I'm asking you a second tier question, can a company say, for this category of people that are employed, we're going to have retirement plans, and for this category over here, we're not, can they do that? Apart from protected classes. With the caveat that I'm not an ERISA lawyer, I believe that's correct. So I'm just having trouble seeing what all the talk is about here. All they have to do is point out that these aren't retirement plans, assuming, I know they claim that this, I don't know, extended benefits for one year or whatever it's called is a retirement plan, but there's arguments you can make pro and con on that. I'm sure they're not relevant here, I guess, but I'm just trying to see what the overall, if you're talking, if it's true, as you say, that they negotiated not to have retirement plans and they didn't have retirement plans, then if that's true, I understand that's contested, but if you are able to demonstrate that to the court, then the stakes here are pretty small, then, aren't they? Well, but they had retirement plans for the employees, and that's, I understand, but that's what your understanding, which we have to ask an ERISA lawyer, is that you can have retirement plans for certain categories and not for others. And that's our argument, Your Honor. I mean, I guess the question is better framed towards the plaintiffs to explain. Well, I'm asking about the stakes. If that's true, then you're really upset about something that's not that big a problem. But I think what the district court, the gravamen of where the district court is going is by its conclusion that these are, in fact, employees, it makes, I think, where the plaintiffs are going is then they have to be awarded this panoply of benefits. That would be a contract issue, not an ERISA issue. Their framing is an ERISA issue, Judge. And I mean, a lot of... You're just fighting this at the first... I'm fighting this at the first level. There's a whole lot that has to get done at the second level if we get there. It's going to be really complicated, which is why the judge certified it in the first place. Is it that, I mean, even if we follow Judge Rogers' line of reasoning, it might well be that you would have to redo all of the contracts to make sure that they couldn't win on the argument that once you say they're employees, then the contract doesn't keep them out because we're going to call them employees. So you might have to redo every contract to try to make sure you would hope. There would be a huge unscrambling the egg problem as well. Let me ask you one thing. Your time is almost out. Should we look at our review as a matter of law or he made factual findings? So how much factually are we reviewing only for error? We're not challenging the factual findings, Your Honor. We are challenging the legal conclusions. Some of these are mixed questions, but ultimately it is de novo review. And I think what we're recognizing is even when we talk about the weighing of the factors, that's an issue of law. And when we look at these... You're not making any clearly erroneous arguments then? No, we're not. We're not. Well, since this is an interlocutory appeal, you have to concede the factual findings. Exactly. Exactly. Which is why we're not contesting the judge. If I could, in ten seconds, make a point about the representative evidence, which was our last argument, and I think the best way to encapsulate this is look at the judge's ultimate conclusion, where the court says some managers, in fact, exercise control over some agents. But ultimately, we don't know how many. We don't even know if it was a majority. And this is why the failure to have findings related to representative evidence is ultimately fatal to the conclusion on a class-wide basis. Thank you. Good morning, Your Honors. May it please the court, my name is Chuck Krieger. I represent the Plaintiff Appellees. I really have three points to make, and actually kind of a fourth to address all your ERISA questions, Your Honor. So the first is, we agree that this is a remarkable case. It's not like Weary. It's not like Ware. It's not like Wolcott. And it's remarkable because of American Family's conduct, which was intentional. They told the agents that they were going to be independent contractors with full control, and they trained the managers that you can treat them like employees, and you can control what they do and when they do it. And there are explicit findings of fact, which we've already agreed now are no longer subject to a review, clearly erroneous review, that American Family could have the agents service how they sold insurance and how they service customers. And paragraph 30 of the court's findings actually gives examples of things they would do. And what is happening and why it controls actually the amount of time they have to work and things like that, is American Family managers, if they think it's better to do it this way to sell insurance, you're going to do it that way. They're going to substitute their judgment for your judgment. Your argument is that this is radically different than the rest of the insurance industry, that if you probed other companies, you wouldn't find managers being given encouragement to keep an eye on their agents? There's a difference between keeping an eye on your agents and controlling the agents, your honor. And in this case, we even had, it is remarkably different, we had a senior former officer of the company come in and testify and say, admit that he and other American Family officers misled the agents and the company always intended to treat them as independent contractors. And we had a current, I believe a current officer. Always intended to treat them as independent. I'm sorry, always intended to treat them as employees. Thank you for correcting me on that. And we also had a current, I believe a current officer of the company testify on questions from their attorneys about how American Family interprets the contract to allow them to do these different things. When you say how they interpret, this is the part where it first says you're independent contractors, then it says, you know, we can control you, but then it says if there's any conflict between them, the first, the first one controls. Yes, your honor. Mr. Stephan, who's the American Family. Just what the contract says, right? Right. Well, he says you have to, it's a very vague phrase. You have to follow our production and service requirements. And then all of a sudden. The next phrase is not vague. It says in case of any conflict, the first one controls, right? Right. But then he said this is what allows us to say you have to do so many personal insurance reviews a month, which is a sales technique. You have to do cold calling at night, even if you don't want to. You have to do this type of a sales technique. This is what gives you people. And quite frankly, your honor, I don't know if a lot of other insurance companies do this, and I somewhat doubt it because American Family is a very promote from within. So the managers used to usually be agents. It seems to think that they're pretty much in the mainstream, don't they? Well, I can't find a case. I can't find a case, your honor, that has anything like this. I cannot. My colleague said, and I didn't call him on it, that there were cases already involving American Family. I'll ask him again, but do you know what he was referring to? Which case? There's a few cases, individual cases, involving American Family agents, like Worthingham, and there's another one. These are generally pro se cases. The evidence that was involved, we never had all the evidence that we managed to get in this case. Can I ask a question about ERISA? Oh, I'm ready for it, your honor. This appeal only deals with whether they are independent contractors or employees for ERISA purposes. Is that true? Yes. So arguments can be made later by analogy or whatever, but the holding, one way or the other, will relate only to ERISA. Yes, your honor. If you were to kind of focus on ERISA related issues, because that's all we're discussing, with respect to ERISA related issues, this starts to look a lot like an independent contractor, doesn't it? Because they're told, take care of your own retirement, don't look to us. No, it looks nothing like an independent contractor arrangement under the common law. Isn't that what the theory of the exception under ERISA is for? It's like you've got employees, we've got to protect those employees. We don't want you promising employees things and then not backing it up with secure investments and all of that that ERISA protects. Whereas there's no protection for independent contractors, presumably because they're supposed to be out there getting their own plans. Is that right or am I misperceiving the nature of the scheme in big terms? In big terms, your honor, here's what this case is really about. American Family gives the agents a retirement plan. They call it a retirement plan. The court made a finding of fact that it's a retirement plan. It's a defined benefit plan. There's really no doubt it's a retirement plan. It pays a lifetime annuity at page 65. Our claim is that if you treat them like employees. It gives that to independent contractors? Yes, yes, your honor. It is a defined pension plan. Is it described in your briefs? We did not go into it in our briefs. There is testimony on it and the court made findings of fact that it is a retirement plan. So there is a retirement plan for, well, I'm curious about that. Yes, there is a retirement plan for the agents. It's set forth in the contract. It's a joint exhibit one. There's actually an amendment to the retirement plan if we want to get in that. I can't remember the joint exhibit numbers. It's in the agent contracts. It's sold to them as a retirement plan. They're told you have a retirement plan. As for that contract that you ultimately want ERISA protection? We just wanted to comply with ERISA's minimum protections. We wanted to comply with the vesting and everything else. I read the briefs. I can't say I read all the amicus briefs, but I read all the parties' briefs. I remember a discussion of an extended payment plan that only related to what had happened in the previous year before you no longer were an agent. You're not talking about that. Yes, that's actually it, your honor. So what happens, it's based on your time in service, so the number of years you've worked for the company,  And then that's plugged into a formula. So if you earn nothing for six months, you get nothing? That would be very hard to do, but yes. I think that would actually be... Sounds like a retirement plan. That's a retirement plan? It's called a retirement plan? Well, they call it extended earnings, but they account for... Extended earnings sounds like you continue to get commissions for a short period even though you've left the company. That doesn't sound like a retirement plan. It looks exactly like a retirement plan. It isn't part of the insurance industry. You sell a policy, and then you get earnings from it way out into the future, and that's why you're very unlikely to have a zero the last six months. No, you're very unlikely to have a zero, your honor, because you're going to have some earnings. They might be small, they might be large, but it's unlikely that you're going to be at zero because you're going to have... Simply because it's called a retirement plan doesn't mean it has to come under ERISA if you're genuinely an independent contractor. Is that right? I mean, you can have a, quote, retirement plan for a genuine independent contractor if they've worked for you for a long time. Well, you cannot have an ERISA protected... I understand, but... And it's very... I'm accepting for the moment that this thing is called a retirement plan. That's not the end of the case, right? I think once you give them a retirement plan, you're making them look more like employees because you're there for the long-term benefit, and that's what this does. So once you call it a retirement plan, that is almost dispositive of there being employees? It's one factor that leans in favor of them being employees, yes, your honor. But you seem to say it's very important. I think it's very important. The district court didn't find it as important as I did, but I think it is very important. Can I ask about it, though? Sure. Because I'm still kind of mystified as to the nature of it. I don't want all the details. I'm sure you could explain why. I just want to get the big kind of scheme. Right. When you say the last 6 months or the last year, that suggests to me that what you earned in the previous 10 years that you've been working for them, or 20 years, has no relation to how much you get. Is that wrong or right? That is right, your honor. That doesn't sound like any benefit plan I ever heard. It just sounds like a lot of benefit plans, your honor, because... Where you work for 20 years, but it's only the last year that tells you what you get? Yes. That's entirely permissible under ERISA. There are benefit plans that are like that. They're based on what your last year of earnings are, or maybe an average of your last year. I understand. Oftentimes, it's your last year of earnings multiplied by something that reflects the fact that you've been working for them a long time. Your honor, I... This year, it's not, or it is? Yes, it is, your honor. That part I would have to be more clear on. There's two components to the formula. One is the amount of time that you work. The amount of time that you work increases a percentage of whatever your final earnings are. That does sound like retirement. It goes from, I believe, it's 50% all the way to 250% that you multiply your final earnings by. That then becomes the number, when you're at 65, that they pay out a lifetime annuity. Thank you. That's helpful. The other point I'd like to make, your honor, is the district court, we're not really talking about the district court applying like any strange statement of the law. It just applied Darden. It applied the Darden factors. It found some were in their favor, some were in our favor, but it really looked at the right to control. It said, listen, they can control the job performance of the agents. They train them to do that, the managers, and they can control the employment opportunities. And based on that, he found that they're employees. And there's a lot of hue and cry that this is going to change the insurance industry and everything like that. It's not going to do anything. Nobody else does this, your honor, that I can see. You can see it in all the, you can read all the cases. Amongst all the cases, the agents are free to do and sell insurance as they please, and that's why there's no control found over them. Since the factual findings are undisputed on appeal, what are the central legal issues in dispute between you and your opposing counsel? Is it how control is legally defined, or what particular legal issue or issues does this appeal turn on? Your honor, my view is it turns on exactly kind of what he was going on, and it's not even a legal issue. It is a dispute about a finding of fact, because they keep on trying to pick it apart. They have to concede the factual findings on this interlocutory appeal, don't they? But they don't when they start to say he only found that they controlled goals and not the means of achieving those goals, and that is 100% wrong. This was the whole trial. We had three weeks of trial about whether they're controlling and setting just goals, like you have to sell 14 policies a month or something like that, and if you're going to have to control how you're going to sell 14 policies a month or how you're going to service customers, and they lost. And the court made explicit findings that they lost, but we're still here arguing about whether it's goals or the way of achieving those goals. And the final point I'd like to make, your honor, is just on this representative evidence issue. We proved that they have a policy. The court made numerous findings of fact that they have a company-wide policy, that they train all their managers the same. They write it down that they can do this, not in one document, in numerous documents. But a district court made findings about that, so why are we spending time on that right now? The case law and the legal issues, isn't that what we should be looking at, as applied to the facts that the district court did find? We should be, your honor, but that is not really their appeal. Their appeal is really talking about did the district court really find this or what do you really mean when he says controlled manner and means? Well, let me ask you about that because it's headed findings of fact and conclusions of law. There are 117 findings of fact. And then the conclusion, though, to me, is where most of the language you've just been adverting to comes in. They expected the managers to exercise such control. It's trained its manager. Most of those things are in the conclusion. So isn't it fair to say that we accept the findings and then we look at whether the conclusions of law follow from those findings and from the preexisting law because a lot of those findings clearly are similar to findings that have led to different conclusions of law in other cases. Is that fair? I just want to make sure I understand, your honor. Are you talking about where Judge Nugent, he has a whole set of things, just findings, and then he has right at the end, I think it's page 40. But it's headed. That's what district judges do usually, isn't it? Findings of fact, conclusions of law. He does make some conclusions of law. And I was just adverting to the fact that it sounded like that the things you were quoting were primarily and almost verbatim from his conclusions. I'm asking if that is that. No, your honor. I think he makes these in finding of fact number four, finding of fact number five, where he does a juxtaposition between what American Family says in the contract and what American Family says in the manuals. And then when you start on page 40, or actually also paragraph 30, where he makes findings of fact about all sorts of activities that agents can be forced to do, sales activities, and when you look at page 40 through up to 43, which there's statements of law in there, but there's also a lot of conclusions of fact. They're just factual conclusions. You said finding four. That's the one that says agents should be treated as independent contractors? That's what the contract says. And then the next one after that says, but American Family in their manuals. Expected the sales managers to. Okay. Yes. And I see I'm out of time, your honor. How as a practical matter could it be conceivable that for tax purposes these people are independent contractors, but for ERISA purposes they're not? Could that ever be a workable system? Honestly, your honor, I really don't know. And I don't know if that would happen going forward. I think what the conceivable system going forward is American Family just fixes how it treats its agents, and it did it before. How far back do they have to go? Well, they would just start at day one. I mean, I think they would have an ERISA plan up to whenever the judgment goes in. If they can't be teased apart, then we have to figure out, doesn't the tax go back three years or something like that? Don't they have to redo all their taxes? There's nothing that requires them. The agents, there's nothing that would require the agents to file amended tax returns. But that would mean the government, isn't the argument the government could say, hey, we've suddenly discovered that all of these folks are not independent contractors and therefore they can't deduct many things they're deducting? Right, your honor, but the government, they might have a policy to go after the people who do the misclassification, but I'm not aware of the government going after employees for being intentionally misclassified. There is a clear state of policy to go after the companies, but they don't hunt down the employees and punish them for being misclassified. Isn't that what WARE was about? Wasn't WARE a tax? Where they claimed to be independent contractors, the tax people tried to say they weren't, and we came down saying they were, right? In that case, WARE initiated the dispute. WARE wanted to deduct it. Because they came after him. Well, because he started deducting it. And they disagreed with him, so now they would have a basis to disagree with all of these agents. Perhaps, your honor, but I don't think in reality that's what the IRS does. No, the IRS does a lot of funny stuff. Okay. There's no further questions, right? No, no further questions. Thank you. Rebuttal? Judge Boggs, to answer a couple of your questions, Moore was a Seventh Circuit decision that went in our favor. Wortham was an Eighth Circuit decision that went in our favor, both cited in our briefs. There were some unpublished district court decisions that reached the same conclusion as well, that American family agents are independent contractors. To answer another one of your questions, the judge did not issue 117 findings of fact. It's labeled findings of fact slash conclusions of law, and he's making conclusions of law in the middle of this, not differentiating, which is part of the challenge. And, Judge Rogers, to respond to your question about the extended earnings, extended earnings, that exact, maybe not the exact type of plan, but a very similar extended earnings plan was at issue in Walcott. And, again, it gave the court no pause in reaching an independent contractor conclusion. And this is not like your protocol. If they were subject to ERISA, would it be a plan that would have requirements under ERISA? Your Honor, it's possible if that was. Our whole point is you don't get to that step. I understand. I'm just looking ahead a little bit and asking what the ramifications of the case are. The ramifications are real different answers. The ramifications is they don't just want something related to the extended earnings plan. They want all these other benefits, which is how this gets... I asked you about that before. Now I'm asking you about this thing. I'm sorry. The thing, the way he describes it, sounds like a standard run-of-the-mill retirement plan. You've been working for 18 years, and so if you've been working for more than 15, you get 75% of whatever you earned during your last six months or something like that. That sounds like a retirement plan. If you just say, well, you get a commission, but your commission only goes while you're working for us, but we'll let it go an extra amount of time for the ones that you sold in the last six months, that doesn't sound like a retirement plan to me. But this is not something that you get upon turning 65 or whatever the magic age is. I think it's a 10-year vesting requirement. So if you start the company at age 22, and you leave at age 32, and you've vested under... contractually agreed to, you get that then. You don't wait until you're 65. And that's where it's different. There's all kinds of HRSA-protected plans that do that, aren't there? I think that most of them are pushing it out to when you're retirement age. But the point is, they're not just asking for that. They're asking for health benefits as well. That's not before us. Well, but that's where they're going with this case, Your Honor. I understand. Okay. I'm just trying to provide the context. But I think ultimately, Your Honor, on the issue of control, the district court misunderstood the concept under Darden. It did not apply it consistently with where, and for all the reasons that we explained in our brief, we'd respectfully request reversal. Thank you. Thank you very much, and the case is submitted. Thank you.